IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| **v.** | **NO. 1:10-CR-059-CAP-GGB** |
| **FIDEL EUSEBIO MARCELINO,** | |
| **Defendant.** | |

## FINAL REPORT AND RECOMMENDATION AND ORDER

Defendant Fidel Eusebio Marcelino ("Defendant") is charged with one count of being an illegal alien in possession of an automatic handgun, in violation of Title 18, U.S.C. Section 922(g). Pending before this Court is Defendant's motions to suppress statements and evidence. (Docs. 10 and 11.) An evidentiary hearing on these motions was held before me on April 27, 2010.[1] All transcript references are to the transcript of that hearing. (See Doc. 16.)

Law enforcement officers stopped Defendant and seized a gun from him on January 19, 2010. As discussed below, I find that the officers did not have reasonable

---

[1] Within Defendant's Motion to Suppress Evidence is a motion for an evidentiary hearing. As noted, an evidentiary hearing was held before me on April 27, 2010; therefore that part of Defendant's motion is **DENIED AS MOOT**.

AO 72A
(Rev.8/82)

suspicion to stop Defendant. Therefore, I recommend that Defendant's motions be GRANTED.

## I.  FACTS

On January 19, 2010, Immigrations and Customs Enforcement ("ICE") Special Agents Stewart Reagan and James Ballard stopped and detained Defendant Fidel Marcelino and a companion along Buford Highway in DeKalb County, Georgia. TR 5-7. The agents were working in the Gang Unit, which included members of the DeKalb County Police Department, whose job is searching for gang activity. TR 6-7. The area in which they were patrolling was known to them to be a high crime area and a hotbed for gang members and activity. TR 7, 19, 30, 47-48. Agent Reagan had personally made arrests of gang members in that area, including alien gang members. TR 48. Agent Ballard was new to the gang unit. TR 6, 18.

While patrolling, the agents saw two men walking southbound on Buford Highway through the adjacent parking lots of several retail stores, heading toward a Quik Trip ("QT") convenience store. TR 7-8, 17. It was approximately 5:30 p.m. and still daylight outside. TR 16, 65. Agent Reagan decided to stop and talk with them, in part because the defendant was wearing loose baggy clothing including a silver and black hooded sweatshirt, which could have been possible gang attire. TR 8, 18, 49.

The agents pulled into the QT parking lot and parked, and when the two men walked by their car, the agents got out and spoke to them. TR 8, 49.

When the two men were several feet beyond the vehicle, Agent Reagan said "Hey amigo," or "Hola amigo" to them in Spanish. TR 8, 49. Agent Ballard testified that the defendant and his companion "glanced back and looked in our direction and then turned away from us and started to walk away from us," that "both of them turned, looked in the direction of us, but the two walked slowly away." TR 8:4-6; TR 22:24-25. They did not run. TR 23. As the men walked away, Agent Ballard spoke to them in Spanish, saying "Policia," indicating that the agents were police officers and asking the men to stop. TR 9-10. Agent Ballard testified that the men "glanced back one more time and then they continued to walk away and appeared to be walking a little bit faster than when they first started walking away the first time." TR 10:16-18. Agent Ballard then said in Spanish, "Sir, don't you run from me." TR 10, 24, 50. The men paused, and the agents approached them. TR 10, 57. The men stopped and did not run. TR 24, 58.

Agents Reagan and Ballard were dressed in casual clothing but were armed and identifiable as law enforcement officers. TR 11. Agent Reagan wore a vest or shirt with the word "Police" across the front and back, along with a visible ICE badge.

3

TR 11, 23.  Agent Ballard wore a large, shiny, gold badge around his neck that read "ICE" and "Special Agent" and a visible, gold ICE badge on his belt.  Id.

When the defendant and his companion stopped, Agent Ballard walked over to them, placed his hands on their shoulders, brought them back to the vehicle, and put the defendant up against the wall.  TR 25, 58.  Agent Reagan asked the defendant in Spanish if he had any weapons on him, to which the defendant replied, "No."  TR 50-51.  Agent Ballard then questioned and searched the other individual while Agent Reagan handled the defendant.  TR 12, 26.  Agent Reagan told the defendant that he needed to check him for weapons and then frisked him over his clothing.  TR 51, 58.  The defendant wore three shirts that were bunched up over his waist.  TR 53.  Agent Reagan conducted a patdown of the defendant over his clothing and did not feel or find any weapons.  TR 53-54, 58-59.

Following the patdown of the defendant, Agent Reagan continued to question him in Spanish regarding his identity and any possible gang affiliation.  TR 12, 31, 52 59.  The defendant told Agent Reagan that he was not in a gang or involved in any gang activity.  TR 61.  At this point, Agent Ballard had finished attending to the second man and turned his attention to assisting Agent Reagan.  TR 12, 32.  In the meantime, two

AO 72A
(Rev.8/8
2)

more ICE agents and two DeKalb County Police officers in a marked patrol unit arrived on the scene to provide backup. TR 12, 32, 64.

Agent Reagan began to question the defendant about having tattoos, though he did not see any tattoos on him that would indicate gang membership. TR 13, 61. The defendant told Agent Reagan that he did not have any tattoos. TR 12, 52, 61-62. Agent Reagan asked the defendant to show him, and the defendant turned his back and lifted up his shirt to show that he had no tattoos on his back. Id. The defendant turned around facing Agent Reagan, and Agent Reagan asked him if he had any tattoos on his front on his chest or stomach. TR 13, 52. Agent Reagan testified that the defendant then became very anxious talking to him, his hands were trembling, and his eyes were darting away from him and looking around. TR 52. Agent Reagan asked him again if he had any tattoos on his front, and the defendant responded that he did not. Id. Agent Reagan asked him to raise his shirt to show him, and the defendant refused. TR 13, 52. The defendant held his hand right around his waist, his fingers began twitching and trembling, and he looked very uncomfortable. TR 13, 39, 52-53. Observing this behavior and believing that the defendant might have a hidden weapon, Agent Ballard lunged forward, grabbed the defendant's hands, and pinned his hands to his body. TR 14. Agent Ballard then leaned the defendant into the wall and started raising his hands

5

up high in order to get his hands away from his waist in case he had a weapon. TR 14. When Agent Ballard raised the defendant's hands, his shirt lifted up. Id. Agent Ballard saw a gun tucked in the defendant's waistband and shouted "Gun, gun, gun!" Id. Agent Regan took the gun, a Bersa 380 automatic handgun, from the defendant's waistband. Id., 45, 53. When asked at the evidentiary hearing how he missed the gun in Defendant's waistband during the patdown, Agent Reagan testified that, "I must have conducted a poor search." TR 53:20. The officers handcuffed the defendant, and he was arrested by DeKalb County Police officers on stolen gun charges. TR 14. Defendant was transported to the DeKalb County Jail, where Agent Ballard gave him the Miranda warnings in Spanish. TR 67-68. Defendant subsequently made statements to Agent Ballard. TR 44, 68.

## II.    PROCEDURAL BACKGROUND

Defendant was indicted in this Court on February 9, 2010, for unlawful possession of a firearm by an illegal alien in violation of 18 U.S.C. § 922(g)(5). Defendant filed his Motion to Suppress Statements (Doc. 10) and his Motion to Suppress Evidence and Statements and Request for an Evidentiary Hearing (Doc. 11) on March 10, 2010. I held an evidentiary hearing on Defendant's motions on April 27, 2010, in which Agents Ballard and Reagan testified. (Min. Entry for Proceedings, Doc.

6

15; Tr. of Proceedings, Doc. 16.)  Thereafter, the Government timely filed its response opposing Defendant's motions (Doc. 17), and Defendant timely filed his reply (Doc. 18).

The Government concedes that the agents' encounter with the defendant amounted to a seizure at the point when Agent Ballard said, "Sir, don't you run from me." (Doc. 17 at 7.)  The Government argues the agents had reasonable suspicion to justify the subsequent investigatory detention. (Id.) Defendant contends that the agents lacked the required reasonable suspicion of criminal activity for the investigative detention, and lacked probable cause for the subsequent arrest, in violation of the Fourth Amendment.  (Doc. 18 at 7.)

### III.  DISCUSSION

The Fourth Amendment permits the Government to stop and briefly detain a suspect, on less than probable cause to believe that a crime has been or is being committed, to investigate a reasonable suspicion that the suspect has engaged in or is about to engage in criminal activity. Terry v. Ohio, 392 U.S. 1, 21-22 (1968); Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000).  "Reasonable suspicion consists of 'a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable.'" United States v. Yuknavich, 419 F.3d

7

1302, 1311 (11th Cir. 2005) (quoting United States v. Knights, 534 U.S. 112, 121 (2001)).  To determine whether reasonable suspicion exists, courts evaluate a totality of the circumstances from the viewpoint of a reasonably well-trained officer, United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000), taking into account the fact that an experienced officer can infer criminal activity from conduct that may seem innocuous to lay observers.  United States v. Arvizu, 534 U.S. 266, 273-74 (2002).  Reasonable suspicion "must be more than an 'inchoate and unparticularized suspicion or hunch.'"  United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (quoting Terry v. Ohio, 392 U.S. at 27).  The officers or agents involved in the challenged law enforcement activity must "articulate some minimal, objective justification" for an investigatory stop.  United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999) (citing Sokolow, 490 U.S. at 7, and United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989)).  The Eleventh Circuit has further stated:

> When making a determination of reasonable suspicion, we must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.  It is clear that an inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required.

8

Yuknavich, 419 F.3d at 1311 (citing United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003).  The Court continued:  "The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  Id. (internal citations and quotations omitted).

The Government argues that the agents had the requisite reasonable suspicion to justify a Terry stop of the defendant based on three factors:  (1) the officers were patrolling a well-known, high crime gang area; (2) the defendant was wearing loose, baggy clothing in colors that indicated gang membership; and (3) when the agents approached them, the two men immediately walked away and, when spoken to a second time by the agents, continued to walk away, this time even faster.  (Doc. 17 at 9.)  Defendant argues that these circumstances are insufficient because they do not individually or as a whole create a reasonable suspicion that he was involved in criminal activity.  (Doc. 18 at 9.)

While there is no exhaustive list of specific factors required for "reasonable suspicion" to justify a Terry stop, factors that the courts have considered contextually relevant in determining the validity of a Terry stop include:  (1) a report of a recent and serious crime, United States v. Raino, 980 F.2d 1148, 1150 (8th Cir. 1992); (2) furtive conduct suggesting consciousness of guilt, Wardlow, 528 U.S. at 124 (e.g., headlong

9

flight); (3) furtive gestures, Florida v. Rodriguez, 469 U.S. 1, 6 (1984); (4) nervous apprehension at the approach of police, United States v. Brignoni-Ponce, 422 U.S. 873, 855 (1975); (5) suspicious presence in a "high crime" area, United States v. Atlas, 94 F.3d 447, 450 (8th Cir. 1996); (6) proximity to the scene of a reported crime, United States v. Aldridge, 719 F.2d 368, 371 (11th Cir. 1983); (7) an officer's experience and specialized knowledge, United States v. Arvizu, 534 U.S. at 276; (8) an officer's knowledge of a suspect's reputation, United States v. Kimball, 25 F.3d 1, 7 (1st Cir. 1994); (9) information from a reliable informant, Adams v. Williams, 407 U.S. 143, 145-146 (1972); (10) resemblance to a witness's or victim's description, United States v. Martin, 28 F.3d 742, 744-745 (8th Cir. 1994); and (11) evasive answers to police questions, Devenpeck v. Alford, 543 U.S. 146, 155-56 (2004). United States v. Camacho, 608 F. Supp. 2d 178, 182 (D. Mass 2009).

The first factor the Government relies upon to support the stop is the defendant's presence in a high crime gang area. Although an officer is not required to ignore the characteristics of location, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Wardlow, 528 U.S. at 124 (citing Brown v. Texas, 443 U.S. 47 (1979)). See also United States v. Brown, 731 F.2d 1491, 1493

10

(11th Cir. 1984) (holding that determination by police that defendants came from a "source city" for distribution of narcotics was insufficient to create a reasonable suspicion warranting a Terry stop). The Government cites to United States v. Briggman, 931 F.2d 705 (11th Cir. 1991) for the proposition that presence in a high crime area can create reasonable suspicion to justify a Terry stop. However, in Briggman, the officer had reasonable suspicion to make a stop based upon the following factors not present in this case: (1) the suspect was parked in a parking lot at 4:00 a.m. in a high crime area when commercial establishments served by the lot were closed for the night, (2) the officer had not seen occupied vehicles in that lot at that time of the night on his previous patrols of the area, and (3) in departing the parking lot, the suspect attempted to evade the officer. Id. at 709. This case is distinguishable from Briggman because Defendant was walking with a companion through parking lots adjacent to a highway at approximately 5:30 p.m. when it was still daylight outside and commercial establishments such as the QT were still open. Thus, the defendant's presence in a high crime area is insufficient to support reasonable suspicion.

The second factor the Government relies upon to support the stop was that Defendant wore loose baggy clothing in colors (black and silver) indicating gang

11

membership. However, the Government did not present any evidence to show that black and silver loose baggy clothing are tied to or represent membership in a particular gang. Other courts that have relied upon gang affiliation to justify a Terry stop, including those cited by the Government, had more evidence to support the defendant's ties to a specific gang and other factors present to support a determination of reasonable suspicion, than this case. Cf. United States v. Feliciano, 45 F.3d 1070, 1074 (7th Cir. 1995) (officer recognized suspect as a gang member who had just been released from prison; gang affiliation and prior criminal acts are permissible components of articulable suspicion analysis); United States v. Santio, 351 Fed. App'x 324, 328-29 (10th Cir. 2009) (suspect observed in a high crime area at 3:30 a.m., acted nervously, wore all blue clothing and a long white belt indicative of local gang affiliation); United States v. DeJear, 552 F.3d 1196, 1200-01 (10th Cir. 2009) (suspect appeared nervous and attempted to conceal something in the car seat and people standing outside nearby house in a high crime area wore colors affiliated with local gangs); United States v. Am, 564 F.3d 25, 30-31 (1st Cir. 2009) (officers were aware of suspect's known gang affiliation, past criminal conduct, proclivity to carry a firearm, and stopped suspect in a location of known gang violence); United States v. Vasquez-Ortiz, 344 Fed. App'x 551, 554 (11th Cir. 2009) (officers observed suspect sitting atop a staircase in a public

location, known to be a hangout for gangs with illegal alien membership, and dressed in specific attire and having a visible tattoo indicating gang membership).

I find guidance in a recent case from the District of Massachusetts that is factually similar to the circumstances here. United States v. Camacho, 608 F. Supp. 2d 178 (D. Mass, 2009). In that case, the officers responded to a series of 911 calls reporting a fight in progress in a high crime gang area involving the Latin Kings, a violent Hispanic street gang. Id. at 180. The responding officers, members of the police department's Gang Unit, saw the defendant and a companion walking at a normal pace along the street where the fight had been reported. Id. The Court stated:

> The stop of Camacho and Osario-Melendez cannot be justified under the principles of *Terry*. The most that can be said is that the two men were observed in a high crime area walking away from the vicinity of a street fight that one caller reported as involving Latin Kings. . . . Neither man was known to the officers nor (as the government candidly conceded at the suppression hearing) was there any reason to believe that either man was affiliated with the Latin Kings. The men were walking normally on a residential sidewalk and displayed no apprehension or nervousness when the officers approached.

Id. at 184. In the instant case, although the Government alleges a gang connection to support the stop, that connection is tenuous at best, and I do not find that it supports reasonable suspicion.

13

The Government does not cite to, and I am unable to locate, any case holding that an officer's speculation that certain clothing colors may be affiliated with gang membership without any other articulable factors constitutes reasonable suspicion. When asked why he decided to make the stop, Agent Reagan testified that, "I observed the defendant in an area that, to me, was a known gang area, he was wearing attire that, although not specifically indicative of gang activity, did –**I guess I just had a hunch**. His attire – it could have been termed gang clothing." TR 48:24-49:2 (emphasis added). Agent Reagan then described Defendant's attire as "a dark-colored hoody, a black hoody. He had on just loose hanging clothes, you know, baggy clothes that not only could you – could you conceal items in, but also, you know the colors were pretty significant, black and silver. Again, those aren't necessarily indicative of any particular gang but, you know, some gangs **may** claim those colors." TR 49:4-9 (emphasis added). Agent Reagan further testified that he did not recall seeing gang members wearing both silver and black before. TR 49:10-13. Agent Ballard testified that he knew from his gang class that "gangs wear that color. The LA Raider black and silver color," but he could not identify any specific gang that particularly wears those colors. TR 18-19. It is well settled that "an inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required."

14

Perkins, 348 F.3d at 965 (citations and internal quotations omitted). As such, Agent Reagan's "hunch" regarding the defendant's possible gang affiliation is simply not sufficient to support reasonable suspicion.

The third factor that the Government relies upon to support reasonable suspicion is flight of the defendant. Specifically, the Government contends that when the agents approached them, the two men immediately walked away and, when spoken to a second time by the agents, continued to walk away, this time even faster. The Government cites to Wardlow, Franklin, and United States v. Gordon, 231 F.3d 750, 756 (11th Cir. 2000), in support of the proposition that any flight, including walking away, supports a finding of reasonable suspicion. However, those cases are distinguishable from this case because the suspects in those cases ran headlong from the police instead of continuing on their way. In Wardlow, the Court noted, "it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police." 528 U.S. at 124. The Court found the suspect's flight particularly significant, stating: "Headlong flight–wherever it occurs–is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. In Franklin, the suspect was in a problem area, at night, underneath a no loitering sign, and fled from the officers. 323

15

F.3d at 1300.  The court stated: "Franklin's flight is of particular importance to our decision. . . . Franklin's flight was particularly suspicious because of its nature and its duration.  He ran away at full speed as soon as he saw the officers.  **He did not turn and start to walk away.  He did not act like he was going about his business.**  Instead he took off in 'headlong' flight. "  Id. at 1301 (emphasis added).  The court emphasized that, "[w]hile any kind of flight, even walking away, might support a finding of reasonable suspicion, headlong flight–wherever it occurs–is the consummate act of evasion." Id. (internal citations and quotations omitted).  Similarly, in Gordon, the key factor in finding reasonable suspicion was the defendant's flight manifested by him "moving quickly to an adjacent car, entering that car, and then driving away in the opposite directions from the officers."  231 F.3d at 756.

In the instant case, I do not find that the defendant's conduct constituted "flight." Rather, I find that the defendant's conduct was consistent with going about one's business.  Where an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. Florida v. Royer, 460 U.S. 491, 497-98 (1983) (plurality opinion) ("The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.")  As the Court in

16

Wardlow explained: "But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'not going about one's business'; in fact, it is just the opposite." 528 U.S. at 125. Here, both agents testified that the defendant did not run. Even assuming that Defendant here did pick up his pace after the agents addressed him the second time, I cannot say that his behavior constituted "flight" so as to support a determination of reasonable suspicion. Rather, the facts indicate that the defendant and his companion continued to go about their business by continuing to walk in the same direction and manner as when the agents first observed them.  To hold differently would render the concept of a voluntary or consensual stop meaningless because a person would never have the right to continue about their business without creating reasonable suspicion.  Therefore, based on the totality of the circumstances presented to me, I find that the agents lacked the requisite reasonable suspicion to conduct a Terry stop of the defendant, and the evidence obtained from that illegal detention should be suppressed.

After the defendant was arrested, he was read his Miranda rights in Spanish at the DeKalb County Jail, and he subsequently made statements to Agent Ballard.  TR 67-68.  Defendant argues that his statements should be suppressed as fruit of the poisonous tree.  The Government does not counter this argument directly, but rather

17

presupposes that I would find that the defendant's detention and arrest were lawful. (See Doc. 17 n.1.) However, Defendant's statements flowed from his illegal detention, search, and arrest. In these circumstances, it is apparent that there has been an "exploitation of that illegality." Wong Sun v. United States, 371 U.S. 471, 488 (1963) (citation omitted); see also, 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 11.4(c), at 306 n.218 (collecting cases). Giving a defendant Miranda warnings does not break the causal chain between an illegal search and a subsequent confession. Brown v. Illinois, 422 U.S. 590 (1975). Accordingly, based on the foregoing reasons and with good cause appearing, I recommend that the Defendant's Motions to Suppress Statements and Evidence (Docs. 10 and 11) be granted.

## IV.   CONCLUSION

In sum, I **RECOMMEND** that Defendant's Motion to Suppress Statements (Doc. 10) be **GRANTED**, and that Defendant's Motion to Suppress Evidence (Doc. 11) be **GRANTED**. I **ORDER** that Defendant's Motion for Evidentiary Hearing (Doc. 11) is **DENIED AS MOOT**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial. It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this __19th__ day of July, 2010.

*Gerrilyn G. Brill*
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A (Rev.8/82)